Good morning, Your Honors. May it please the Court. Although this case arises in a bankruptcy context, what we're dealing with here is just ordinary Texas contract interpretation. And I submit that the review is de novo. I ask the Court to look at the contractual interpretations, the contractual provisions, and to reverse the lower courts and remand for further proceedings. My clients are what we call the advisors, two companies that help manage billions of dollars of other people's investments. For regulatory and practical purposes, my clients must have a wealth of employees, CIOs, CFOs, CEOs, back office, middle office employees, which as a practical matter, as standalone entities, they cannot afford to do. So as a standard, what they did is they contracted with Highland, the Chapter 11 debtor, to provide those back office and middle office employees for a series of contracts. The primary one that I'll be talking about is the payroll reimbursement contract. That's the one that I believe that the Court should reverse on clearly based on the inequities involved and the contractual language. And then there's also the shared services contracts, which I'll admit are minor, although they do relate to the main contracts. At the end of the day, the fact, and it is a fact that should drive this Court's analysis, is that my client was paying for 20 employees out of 25 who were not there. My clients ended up paying almost $8 million during the course of the bankruptcy case for employees who were not there and for services that were not provided. If we want to look at the language of the contracts, which is what Texas law commands, then those payroll reimbursement contracts require my client to compensate Highland for the actual cost of dual employees. These are reimbursement contracts. The word reimburse is used throughout. These are not for-profit contracts. That's admitted. There's evidence in this record, detailed admissions from Highland, that these contracts became profitable post-bankruptcy because those employees were not there. You knew that your client knew that many of these employees had been terminated, but you continued to pay for about 35 months. That's correct, Your Honor. Now, that is important, and I'm sure opposing counsel, Mr. Morris, will address that at length. First of all, when these contracts were signed, there were certain employees listed on the annex that were not there anymore. It's important to note that these contracts were signed in May, but effective as of a prior date. So that's an easily explained fact. The second fact is that these contracts were in effect for a little over 15 months before the bankruptcy was filed. The bankruptcy was filed in October 2019. As the court probably knows, that generally freezes a debtor's rights. It would have violated federal law for my clients to terminate these contracts. All that we could do was to try to negotiate with the debtor, with Highland, or seek relief from the bankruptcy court to terminate these contracts, which we did not do. So yes, there was a period, Judge Smith, during which my clients knew that they were paying for employees who were not there. But they felt like they could not do anything as a practical matter about that other than to try to engage Highland in the negotiation. There was testimony from both the prior chief financial officer and from my client's officer that they tried, that my clients did try to engage in a negotiation, but that they were basically told it's a no-go. Now, the bankruptcy court did not find that to be particularly credible, and I'm not suggesting that this court is going to reverse the finding of fact today. I'm explaining to Your Honor, Judge Smith, why my clients were paying when they knew that certain of the employees were not there. This is not, however, a voluntary waiver of rights. It's not a voluntary waiver because of the automatic bankruptcy state prohibited my clients from terminating the contracts. And, Your Honor, there is a non-waiver provision in the contracts, which, as we have briefed at some length, Texas law provides, is enforceable. We've never waived a non-waiver provision. But the reason why I think that there is a material dispute is because of the definition in the payroll contracts of the term actual cost. If there was no definition of actual cost, I think that the court would readily agree with me, which is that my clients were obligated to pay only for actual dual employees that weren't there. However, actual cost here, the contractual language, has two components. It first says here's what an actual cost is. It is the actual cost to us of having this employee. And then it says in the absence of modification, the actual cost per month is X. What the bankruptcy court did is it interpreted the contracts to basically be flat fee monthly contracts. In other words, it took the second part, the X, and said, okay, advisors, you are obligated to pay X per month, regardless of the first part of that definition, regardless of whether there are dual employees, regardless of how many dual employees there are. And until you trigger the modification of X, you have to pay X ad infinitum. If you don't read the contract that way, don't you basically render a nullity the set costs? No, Your Honor. I do not believe that you do. What function do they have then? Judge Duncan, I think that that was the initial good faith estimate of what actual cost would be, clearly, however, subject to future modifications. These are highly sophisticated parties. None of them would have believed that these 25 employees would be there ad infinitum. Clearly, there was anticipated future changes up or down, and there was evidence that, in fact, at the end of 2018, there was a true up, and my clients ended up paying well over $1 million more. That evidence, I don't know if it's relevant for today, because, again, what I'm arguing here is strictly a de novo review on the contracts. Judge Duncan, it's Section 2.01, however, that I believe of the payroll reimbursement agreement really governs. This one brings together the theory of actual cost, and then it has two additional elements. I'm going to paraphrase because I don't want to waste the Court's time by reading something that the Court can read, but it says the next point shall reimburse Highland for the actual cost to Highland of certain employees who, one, are dual employees of Highland, the next point, and, two, provide advice to any investment company, etc., etc., etc. So our argument is very simple, Your Honor. The definitional provision should not override the granting clause. It should not override the actual clause by which Highland is entitled to payment, and that clause has two elements that appear after the definition of actual cost, those elements being that there are employees and that they do provide services to SEC-regulated funds. If the Court agrees with me on that, then a reversal is mandated. If the Court disagrees with me on that, then I'll lose my argument. That's what my argument boils down to, that argument. I have two more arguments, which I'll now walk the Court through. The second argument is it relates to these changes because the contract does provide, in Section 2.02, that the actual cost can be changed from time to time. It provides a mechanism for that. Here, this is where the shared services agreements are very important. The shared services agreements are flat fee agreements. The payroll agreements say we're going to pay you, reimburse you for actual employees. Shared services, we're going to pay you a flat fee per month. It is a fat fee, but a flat fee per month, regardless of how many employees you have, as long as you provide the services. Again, the juxtaposition showing that the bankruptcy court erred. Under those shared services agreements, Highland was supposed to scrub our payables, scrub our invoices. It provided accounting services, accounts payable services, back office services. Highland, it is our argument, and the evidence was overwhelming from the CFO to everyone else, that it was Highland that we were paying to look at our payables to make sure that those payables were properly payable, and then to cause us to pay them. Highland had access to our bank accounts, and every month Highland would look at all of our payables, hypothetically, from janitorial services to Internet services to contracts like this. And then Highland would look at those and say, these contracts are properly payable. It would send us the email, and it would then cause us to pay them. Highland wouldn't pay them. We would pay them, but Highland controlled our bank accounts. Our argument, therefore, under Texas law, which we have briefed, is dead, because Highland, through its negligence, failed to bring these overpayments to our attention in order to trigger the overpayment readjustment procedure. That Highland cannot take advantage of that to allege breach of contract by us. This, again, is an issue of law. The bankruptcy court looked at the payroll reimbursement agreements and rejected my argument because it found no duty in those agreements for Highland to bring the fact of overpayment to our attention. The bankruptcy court is right, but the bankruptcy court wholly ignored my argument that it was the shared services agreements, the two lesser agreements, that imposed those duties. And as I brief, there is a standard of care in those agreements. It talks about how they have to keep our accounts basically the same as they would keep their own accounts. Those contracts expressly mention accounting, payroll, accounts payable services. Our argument, again, is a very simple one, that under those contracts, Highland had the obligation to scrub our payables for whether our payables were properly payable before causing us to pay them. If the court agrees with me on that, then the court, again, should reverse and remand. The evidence was overwhelming on the actual negligence. The bankruptcy court rejected my argument as a matter of law. And my final argument, Your Honors, is one that is, I believe, perhaps the most important one because it is the one that rests with equity and fairness. What the bankruptcy court did below, I think, as a court of equity, did not comport with fundamental fairness, and I'll tell you why. The bankruptcy court denied our claim for a refund of overpayments because we did not trigger the modification procedure in the contracts. That is what the bankruptcy court held, that it was our obligation to trigger those procedures and that once we triggered those procedures, that was our remedy. But we did trigger those procedures. The district court actually reversed the bankruptcy court, and the district court found that the December 11, 2020 letter from counsel, my predecessor counsel, to Highland triggered the process of revisiting the actual cost. So the district court agreed with me that we did formally and properly trigger that. Your Honors will recall that the bankruptcy court not only denied my client's claims for overpayments, but affirmatively entered judgment against my clients for some $2.5 million for not paying the last three months of these contracts before these contracts were terminated in bankruptcy. Well, we triggered the process to readjust the actual costs. We should not have had to pay those last three months at the set contract rates. What the district court said, although the district court agreed that the March, I'm sorry, that the December 11 letter triggered the process, the district court said that we, the advisors, did not meet our burden of proof to demonstrate that Highland refused to negotiate in good faith. So Section 4.02 of the contract does say that when the process is triggered, the parties shall negotiate in good faith. We presented evidence that Highland just said, no, they ignored us. Either way, the district court reversed the burden of proof. Highland was now suing us for $2.5 million for the unpaid three months under these contracts after we triggered the readjustment process that it refused to engage in. Highland, therefore, bore the burden of proving all elements for breach of contract under Texas law, one of which is the— An agreement to negotiate, is that an enforceable agreement under Texas law? This is not an agreement to negotiate. This is a written contract signed by the parties where the parties say in the future, here's how we will adjust amounts owing. It's no different, Judge Duncan, than if we're buying future oil or future commodities and there's a market price on Amex or the New York Stock Exchange, and we say, you know, we're going to do 75% of that. We are agreeing on something in the future, but it is not an agreement to negotiate. It is already a fixed enforceable agreement as we brief extensively in our reply. But to round off my argument, if the court agrees with everything else that happened below, I urge the court to look at this issue closely, that because Highland had to prove its breach of contract case against us, after we triggered, according to the district court itself, by our December 11th letter, the readjustment process, we still ended up being ordered to pay by the bankruptcy court $2.5 million for 20 out of 25 employees who did not exist. That has to, if not shock the conscience of a court of equity like the bankruptcy court, at least raise its eyebrows. Thank you, Your Honors. Thank you. And you've saved time for rebuttal. Mr. Morris. Good morning, Your Honors. John Morris for the appellee. Before I get to my prepared remarks, I want to directly address a couple of concepts that my learned counsel put out there. First of all, when he blames Highland for not providing services under the serged services agreement, it's the same person. Frank Waterhouse is serving as his client's treasurer and Highland's CFO at the same moment in time, and he's serving in that capacity throughout the three-year period. He signed the payroll reimbursement agreements himself. He admitted unambiguously that he had all the information he needed in order to assess whether or not the dual employees were there. He admitted under cross-examination that he authorized every single one of those 35 payments that Your Honor alluded to earlier. And most importantly, he admitted on pages 2647 to 49 of the record that he was the advisor's fiduciary responsible for making sure that the advisors paid the proper amount under the intercompany agreements. I don't know what we're doing here. Mr. Waterhouse was in complete control. He had all of the information. He is their agent. He is their officer. He is approving every one of these payments until Highland gives notice of termination, and that's where it goes off the rail. He does exactly the same thing in the 24-month period in 2018 and 2019 when Mr. Dondero is in control of the whole enterprise that he did in the first 11 months of 2020 when the independent board was in control. He changed nothing. The independent board changed nothing. There is no equitable argument to be made here. Next, they got all of the services under the PRA. He told you that they're regulated entities. He told you that they require front office advisory services to do their job, and he admitted to Judge Scholar that they got every single one of these services. This is not a breach of contract claim because Highland failed to provide services. At page 4506 of the record, you'll find the transcript from the district court argument and his colloquy with Judge Scholar where my learned colleague said, I have to agree that under the PRAs, which were the front office services, Highland kept providing front office services to the advisors. It did, and that is an indisputable fact. And to suggest that it would be unequitable for Highland to get paid for the services that it provided is kind of perverse. What they're really trying to do here is get the services for free, and that's inequitable. I'll turn that right on its head where it belongs. As for my prepared remarks, I've given argument I just want to stick to two. The first has to do with the plain and unambiguous terms of the payroll reimbursement agreement. That's what the bankruptcy court found. That's what the district court found, and it shouldn't take a lot of effort, frankly, to figure out if a contract is unambiguous, and in this case, it doesn't. The one point that I agree with is that 2.01 is the starting point. That is the operative and functional provision at issue here, because that is the provision that directs the advisors to pay Highland. The difference that we have here is that Section 2.01 specifically refers to actual costs with an uppercase A and an uppercase C. You can't ignore it. You can't say the parties must have intended something differently when the contract itself tells you exactly what the parties intended in unambiguous terms. Section 2.01 says that the appellant shall reimburse Highland for the actual cost, uppercase A, uppercase C, of services. Actual cost is a defined term and must be given the intent and the meaning that the parties ascribe to it. A point so important that in Section 6.15 Romanet I, the agreement specifically says all of those defined terms must be given the meaning that we give it. The law says that, but just to make sure, belts and suspenders, they put it in the agreement themselves. And what does the definition of actual cost say? It is clear. It is dispositive. It is a specific dollar amount. While the definition certainly begins by referring to actual costs and expenses, it goes on to say, as your honors can see, quote, absent any changes to employee reimbursement as set forth in Section 2.02, such costs are equal to a fixed amount. That's unambiguous. I don't know what we're doing here. Section 2.02 simply provides that the parties may agree to change it. Okay. So what? It doesn't say that Highland has to act unilaterally. There's no cross-reference to the shared service agreement that says, oh, by the way, even though the parties can agree to change, Highland has to do it by itself anyway. There's nothing in here that says that. If they don't like it, if you go and you try to negotiate and you don't get to a good result, they're not without recourse. They can terminate without cause on 60 days' notice. That's in there, too. Their emphasis on the word reimbursement is misplaced because it lacks context. The only context that matters is Section 2.01. When it talks about reimbursement, it talks about reimbursement of actual costs, capital A, capital C. And that makes perfect sense. The PRAs are not personal service contracts. Rather, as the lower courts properly found and basically as conceded here, these are contracts for the provision of front office advisory services that the advisors required in order to fulfill its mandate. Of course, and you're not going to hear anything about this from the appellants, but of course the lower courts also found that if the PRAs were ever deemed to be ambiguous, the overwhelming, undisputed, extrinsic evidence supports the plain and simple interpretation that these are fixed-fee contracts. They make no effort to engage on this point because there's not a scintilla of evidence that suggests otherwise. Instead, they're forced to sit here and suggest that somehow the contract is unambiguously required, actual costs, lower case A, lower case C. Let's just read out of the contract the definition of actual costs. But it begs a host of questions. And, you know, just ask yourself, if that's true, why doesn't it say it? If that's true, how do you reconcile that with the definition of actual costs? If that's true, how come Hyland didn't have an obligation to notify the appellants when dual employees left, when they got raises or bonuses, when the allocation changed, right? They signed the agreements knowing that four of the dual employees were gone. How could Frank Waterhouse, how could the appellants now say that this was supposed to be a contract for actual costs when they signed it knowing it wasn't? Let me just finish by addressing this so-called December 11th letter. It's probably hard to see from the papers, but when we tried this case, the focus was not on the December 11th letter, and it's why Judge Jernigan didn't do much with it. The focus at trial, and you can see it in the joint pretrial order. I apologize I don't have the record site, but it's paragraph 60-something. They say that they dispute that in late 2019, early 2020, they tried to renegotiate. And then in paragraph 80-something, there's a contention of law on the same topic that, again, is limited to this so-called conversation between Mr. Waterhouse and Mr. Caruso in December 2019 or 2020. There's no mention of the letter, but it is in the record. There was some questioning about it, but I don't feel the need to say, oh, they're raising an issue that wasn't preserved on appeal. I don't care. Let's get right to the merits because I'm perfectly fine being there. I don't need a technicality, okay? So, you know, he says he's not going to challenge the court's finding of credibility. There was no finding of credibility. Mr. Waterhouse took the stand, and in response to my cross-examination, he admitted that he never made a request to modify. So when they got to the district court, they had to shift gears. And all of a sudden, these December letters became the operative plea for negotiation. So Judge Jernigan didn't really address it because it wasn't really pressed by the appellants at that time. But Judge Schouler surely did. And, yes, she found that it did trigger an obligation to negotiate, but she found that Highland, under the circumstances, didn't breach it. Why? The district court focused on the timing of the letter. There's no dispute that the letter was sent after Highland had given notice of termination of these agreements. These agreements were going to expire in 50 days. They're not retroactive. You can only have a prospective change. The letter was sent after Highland's disclosure statement was approved, and we were hurtling towards confirmation. The letter was sent the day after we obtained a temporary restraining order preventing Mr. Dondero from further interfering with Highland. And context matters. Second, there's no evidence Highland refused to do anything. It didn't respond to the letter. They're not the only one. There's no evidence in the record that the appellants ever followed up. They ever said, hey, what about that letter? Hey, we want to negotiate. Hey, how come you're not responding to us? They ignored it. It's a lawyer's letter. It's being sent in anticipation of litigation. There are a host of other issues raised in the letter, including the promissory notes that were the subject of this court's decision recently. So that's number two. Third, and this is really, it's not in the briefs, but it's really critical. The parties actually did negotiate three weeks of extensions of the shared services and the PRAs, the intercompany service agreements. They actually did negotiate extensions of that. And you can find that agreement in the record at page 313, paragraph 47 of the joint pretrial order, where the parties agree that it's undisputed that they reached agreement on extensions. Now, this is where, if the court is at all interested in the issue, I'm going to ask you to do a little bit of work because the court can take judicial notice. The extension agreements weren't part of the evidentiary record in this case, but they can be found at the docket in the adversary proceeding 21-03010 at docket 10. It's exhibit 6 and exhibit 10, respectively. They're two separate extension agreements that the parties negotiated in good faith, pursuant to which Highland agreed to continue to provide the exact same advisory services, the exact same shared services at the exact same price required under the agreements on a prorated basis because it's only three weeks. And so that brings me to the final point, which Judge Junkin, you alluded to, and that is, you know, is it even material? And of course it's not material, just like Judge Scholar found. And why is it not material? It's not material because they had no reasonable expectation that it would ever result in any benefit to them. And how do we know that? We know that because it's undisputed the parties were already in a severely adversarial position. We know that because the agreements themselves were money losers from Highland. You can find that in the record at 32-16, page 32-16, where Mr. Seery testified that these contracts were money losers. So even if they negotiated in good faith, is there any basis to believe that Highland, a debtor in bankruptcy, about to get to confirmation is going to somehow reach an agreement to lose more money? Why would they do that? And then finally, of course, as the extension agreements prove, Highland was only willing to continue the services if it got paid the bargain for fee reflected in the intercompany agreements. That's the only condition. That's your proof. What would good faith negotiations have done? It would have gotten them to the same place they got to when they negotiated the extension agreements. Unless the Court has any questions, I have nothing further. Mr. Bruchovina placed a good bit of emphasis on the automatic stay in bankruptcy. Would you comment on that? The automatic stay is irrelevant. You could always go to the Court and seek a modification. The automatic stay simply prevents a party from acting unilaterally, okay? It doesn't mean they can't make a motion. It doesn't mean they can't get relief. It doesn't mean that they could have gone to the Court and said, you know, we're not getting what we bargained for. In fact, and this is really curious, right? They have this administrative claim, and that's why we're here. Again, it's the exact same conduct, the exact same services, the exact same payments that were made in 2018 and 2019, and there was never a general unsecured claim because it would have been kind of ridiculous for Mr. Dondero to come to any court and basically sue himself for negligence because that's what he would have had to have done. He would have had to tell the Court, oh, gee, and I'm entitled to fees from 2018 and 2019 because I overpaid myself. Can't do that. So the direct response to your question, Judge Smith, is that while the bankruptcy stay prevents any party from acting unilaterally, that doesn't mean you just sit there and take it on the chin. Nobody does that. You don't like what's happening? You go to the judge and you ask relief. They did nothing, absolutely, positively nothing until Hyland gave notice of termination. Thank you very much, Your Honor. Thank you, Mr. Morris. Mr. Procovina for rebuttal. Thank you, Your Honor. So the court is to believe that Mr. Seary, charged as a fiduciary over a multibillion-dollar estate, allowed a contract to continue in force for years under which they were losing money? That's hogwash, Your Honors. In fact, the test, not testimony, the documentary evidence below, it's record on appeal 2543 to 44 and 2611 to 12, from Hyland's own controller sent to us, liquidated the annual profits of six, I'm sorry, $7.6 million under these contracts. That's the evidence at trial. Forget what Mr. Seary said. His testimony is not credible or he just admits to losing millions and millions of dollars a year. No, the testimony and the evidence in documentary form was $7.6 million on an annual basis profit. On contracts, there were supposed to be no profit. Mr. Morris says that these were clearly fixed-fee contracts and that we'd be writing things out of them if the court agreed with me. Well, then what about Exhibit A? What about the list of 25 employees? What about their reference to dual employees? If there are fixed-fee contracts, then all you have to do is look at the other two, the shared services agreements that say for a fixed fee we'll provide the following services. Here we have 25 employees and we have the concept of dual employees. So to find that these are fixed-fee contracts, which the bankruptcy court did, I believe, only by resorting to extraneous inadmissible parole evidence, I think that the only way to find that these are fixed-fee contracts is to completely write Exhibit A, 25 employees, and the definition of dual employee out of the contract. Judge Smith, I don't understand how a bankruptcy lawyer can stand up here and tell you that the automatic stay is irrelevant, which is what Mr. Morris did. It is very relevant. It violates the law. It is contemptuous to terminate a contract with a debtor in possession. Yes, we could have gone to the bankruptcy court and sought relief. That relief would have been denied. In any event, we could have. But I do not think you can hold against a party that it might could have had a remedy by seeking discretionary relief from an injunction and didn't even try. I don't think you can hold that against a party when the law says, Thou shalt not terminate. Thou shalt not modify. Thou must pay, which is what we did. Judge Smith, also on the 35 months, that is a problem. I agree. If the court does find that because we paid for 35 months, we are stopped from trying to get a refund, okay. That does not apply, however, to the judgment back against us for the three unpaid months. Maybe we waived our rights for 35 months by paying. That does not, however, and you cannot create a contract by estoppel. That does not mean that Highland now gets to come in and say, Well, pay me for three more months because you were paying for 35 months. The fact that we were highly adversarial and that a law firm sent that letter doesn't mean anything. It triggered the process of readjustment. Judge Sower found that it triggered the process of readjustment. Mr. Morris conflates December 2019 oral communications, which the bankruptcy court found were not credible, with the December 11th letter, which is in writing, which cannot be conflated with anything, and which Judge Sower expressly found triggered the process. They did not cross appeal on that. My only argument is that Judge Sower, the district court, reversed the burden of proof here because where this matters is on Highland's counterclaims back where Highland must prove that it has complied with all provisions. And if we accept the bankruptcy court's interpretation of these contracts, then actual cost is a flat amount unless and until the process of readjusting it is triggered, which we did. At that point in time, yes, Highland has a right to compensation for the last three months. It does. But it can no longer rely ipso facto on the $252,000 and whatever it is, $630,000 in actual costs. It must now demonstrate as a question of fact its damages, which is why a remand would be appropriate. We owe Highland something for those three months, but it ain't $2.5 million. That's my argument on that. Your Honors, I believe I have concluded my arguments. Thank you for your time. I thank you. Your case and both of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow. Thank you. Thank you. Thank you.